UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

BEFORE THE HONORABLE RUSSELL F. NELMS, JUDGE

| | |
|---|---|
| In Re: | ) Case No. 09-42327-rfn13 |
| | ) |
| RICHARD LEE ZIMMERMAN, | ) |
| | ) |
| Debtor. | ) |
| | ) |
| | ) |
| RICHARD LEE ZIMMERMAN, | ) Adv. No. 09-04237-rfn |
| | ) |
| Plaintiff, | ) PLAINTIFF'S EMERGENCY MOTION |
| | ) |
| v. | ) |
| | ) |
| J.P. MORGAN CHASE & COMPANY, et al., | ) |
| | ) |
| Defendants. | ) Thursday, August 26, 2010 |
| | ) Fort Worth, Texas |

Appearances via telephone:

| | |
|---|---|
| For the Plaintiff: | St. Clair Newbern, III, Esq.<br>Clayton Everett, Esq.<br>Law Offices of St. Clair Newbern, III, P.C.<br>1701 River Run, Suite 1000<br>Fort Worth, Texas  76107 |
| For Defendants FNBN1, LLC and PennyMac Loan Services, LLC: | Cristina Platon Camarata, Esq.<br>Brice Vander Linden & Wernick<br>310 Amber Lane<br>League City, Texas  77573 |
| For J. P. Morgan Chase & Company: | Rashad L. Blossom, Esq.<br>Bradley Arant Boult Cummings, LLP<br>One Federal Place<br>1819 Fifth Avenue North<br>Birmingham, Alabama  35203 |
| Digital Court Reporter: | United States Bankruptcy Court<br>Amanda Shelby, Judicial Support Specialist<br>501 West Tenth Street<br>Fort Worth, Texas  76102 |
| Certified Electronic Transcriber: | Palmer Reporting Services |

Proceedings recorded by digital recording;
transcript produced by federally-approved transcription service.

*Plaintiff's Emergency Motion*                                                           2

1    Thursday, August 26, 2010                    4:00 o'clock p.m.

2                        P R O C E E D I N G S

3         THE COURT:  Good afternoon.  At four o'clock we have

4    Zimmerman versus J.P. Morgan Chase.  We are here on an emergency

5    motion of the plaintiff Mr. Zimmerman.  I've authorized all the

6    parties to appear telephonically.

7              Let's go ahead and take appearances.  First of all,

8    let's hear from Zimmerman's counsel.

9         MR. NEWBERN:  St. Clair Newbern, III and Clayton

10   Everett for Mr. Zimmerman.  Your Honor, we — we have this on a

11   speakerphone so that Mr. — you can hear both of us.  I'm not

12   sure that's copacetic, but.

13        THE COURT:  That's fine.  You're fine.

14        MR. NEWBERN:  Okay.

15        THE COURT:  Okay.  And counsel for PennyMac.

16        MS. CAMARATA:  Christina Camarata, Your Honor, for

17   PennyMac.

18        THE COURT:  Okay.  Anyone else?

19        MR. BLOSSOM:  Rashad Blossom for J.P. Morgan Chase,

20   Your Honor.

21        THE COURT:  Okay.  Okay, Mr. Newbern, it's your

22   motion.

23        MR. NEWBERN:  Okay.  Your Honor, this — this adversary

24   was originally filed by Mr. Zimmerman when he was representing

25   himself *pro se*.  He subsequently hired my firm to help him.  And

*Plaintiff's Emergency Motion*                                                      3

1    we have struggled with this case from the very beginning.

2          We spent an inordinate amount of time trying to figure

3    out who all the parties were, based upon a very mysterious chain

4    — chain of ownership of the original note that passed through at

5    least four or five hands.  And when at one of the hearings the

6    Court directed Mr. Zimmerman and his counsel to make sure we got

7    everybody in the chain of title into the — the lawsuit, and I

8    believe we have — we have done that finally.

9          At the present time, it appears that the — the entity

10   that claims to own the note is an entity called PennyMac, which

11   is Ms. Camarata's client.  And I believe that they assert that

12   they acquired this from the FDIC.

13         We sent discovery back in...

14         MR. EVERETT:  March.

15         MR. NEWBERN:  ...in March of this year, with request

16   for admissions, request for production, and interrogatories.

17   And while the requests for admissions were responded to, I

18   believe they were responded to timely, the interrogatories were

19   not responded to until today.  Ms. Camarata told us that she had

20   — thought she had sent them to us, but hadn't.  But she sent

21   them to us today.  So we got their interrogatories today.

22         And in looking at the interrogatories they have — or

23   fall pretty far short of answering the questions.  For instance:

24         Interrogatory Number "1:  Please identify the person,

25   describe the duties of the person answering these

*Plaintiff's Emergency Motion* 4

1  interrogatories.

2        "ANSWER:  Ted Tomescu."

3        We've got his name, but we don't have his duties.  And

4  each of the other interrogatories are, in one way or the other,

5  similarly nonresponsive.

6        And, more importantly, the interrogatories are not

7  sworn to.  So the — the discovery, in addition to being many

8  months late in being provided to us, is — is not even in proper

9  form and, in my view, does not satisfy the requirement to answer

10  the interrogatories in a much more complete fashion.  The — the

11  answers look like they're just about as short as they can.  And

12  if they're not objecting to them, they're giving us some brief

13  answer that doesn't really answer the — the question.

14        THE COURT:  Did — the interrogatory responses, are

15  they dated?

16        MR. NEWBERN:  They — the certificate of service says

17  they were served on us on the 9th day of April, but they

18  weren't.

19        Yeah, the — the only — the only date on the

20  interrogatories is April 9th, in the Certificate of Service,

21  there's — as I pointed out a second ago, there is no affidavit

22  acknowledgment of — of the answers by anyone.  So we — we don't

23  have a date there.

24        The only date on the response, that is the 9th day of

25  April within the Certificate Of Service that said it was sent to

*Plaintiff's Emergency Motion*                                                    5

1    us in the U.S. Mail or via electronic notification.

2          Have I answered your question?

3          THE COURT:  Yes.  Thank you.

4          MR. NEWBERN:  Okay.  The requests for production are

5    also likewise less than satisfactory.  In our — our motion for —

6    to compel, we have attached as Exhibit B the responses to the

7    requests for production.  And many of the requests, rather than

8    providing the documents, they — they object on some kind of

9    basis.  And then they have attached numerous documents to the —

10   the answer.  But they're — they're not — no, they're not tied to

11   the — to the Request for Production Number 1.

12         Normally, when I — when I respond to Requests for

13   Production Number 1, I would say, "Attached is exhibit A" or

14   "the documents responsive to number 1."  They've just — they've

15   just attached documents.  And we're supposed to, I guess, go

16   through them and try to figure out what they're responsive to.

17         But one of the — one of the problems in this case is

18   that the documents that show the chain of title consists of a

19   note and then half a dozen or so allonges, all of which — none

20   of which of the allonges are attached to the note, which I

21   believe the law requires.

22         And when we looked at the originals in Ms. Camarata's

23   present, she acknowledged that the allonges were not attached or

24   affixed to the note.  And so they've got a file of papers with a

25   number of different allonges in there.  And there's two or three

*Plaintiff's Emergency Motion*                                                    6

1    of them that clearly appear to be rubberstamp signatures.

2           And one of the things that we've asked for was the

3    authority in the — to authenticate those documents.  And they —

4    they can't do that.  There's — there's no — there's no

5    authentication of the — of the documents that the person that

6    allegedly signed this assignment is, in fact, who they say they

7    are and that they're authorized to do that.  And I — I don't

8    think we have to take it at face that just because they signed

9    it and they gave us a piece of paper that had their name on it,

10   that that's a proper assignment.

11          In some of the requests for production, they — when

12   we asked for specific documents, the answer is, "Please see

13   response for Request for Production Numbers 1, 5, and 9," rather

14   then being more specific as to what documents they are expecting

15   us to look at.

16          Now this — this is a problem with discovery.  And

17   there's another problem with discovery.  We've been asking for

18   some time for — to take a deposition of a representative of

19   PennyMac who could, you know, identify these documents and

20   explain them to us.

21          We finally took the deposition of Mr. Ted Tomescu, I

22   guess it was the week before last, and Mr. Tomescu really didn't

23   know a whole lot.  And in his deposition — and I don't have it

24   back from the court reporter yet — but my recollection was that

25   there's several places in the deposition where he acknowledged

*Plaintiff's Emergency Motion*                                                        7

1    that there were other people at PennyMac who had more or better

2    knowledge of that particular subject than he did.

3            And he — one of the things that he claims to be is an

4    assistant vice president of MERS, which is the Mortgage

5    Electronic Registers System that some of these lenders used to

6    avoid having to file assignments in the — in the deed records,

7    like the law requires.  And he — he has not been able to

8    establish that he is an assistant secretary or whatever he

9    claimed his title to be, other than just furnishing us loose

10   pieces of paper.

11           And I — I did not complete the deposition of Mr.

12   Tomescu because, for one reason, he indicated there were

13   documents, emails, and I forget what other documents that he did

14   have that were — should have been provided in response to our

15   notice that he didn't bring with them, that he had back in

16   California.  And we were promised that they would provided it to

17   us.

18           And I told Ms. Camarata at the deposition that — that

19   if they got them to us and it was everything that we might be

20   able to conclude the deposition by telephone, without having to

21   bring you back.  But we're having a very difficult time getting

22   all the documents here.  And my suspicion is that PennyMac

23   doesn't have all these document, that all they've got is — is

24   lots of paper with stamped signatures on it.  And that they are

25   — I hate to use the word fraud, but when you file claims and you

*Plaintiff's Emergency Motion*                                              8

1    don't have the documents to back them up, I don't know what else

2    to call it.  And this — these obligations are — have been passed

3    around so many times, I don't think anybody knows who owns them

4    or how they got here.

5           The problems with the discovery are — are compounded

6    by the fact that the PennyMac has now filed two motions for

7    summary judgment, shortly after they filed their Rule 26

8    disclosure, back in the early part of August.  And we've — we've

9    got to either get some relief from when we have to answer to

10   that summary judgment or get real busy trying to answer summary

11   judgments with two affidavits in there of people that — one of

12   whom they can't tell us how to find.  And they've — they're

13   using documents and — and arguments that keep — keep popping up

14   new — new arguments all the time, so it's like trying to hit a

15   moving target.

16          And I just — I guess I've just gotten pretty

17   frustrated with — with this process with — with PennyMac here.

18   And when — when you've got a document that — a claim that

19   provides relies upon documents, I think you're entitled to — to

20   receive all the documents that support that claim.  And it's

21   been like pulling teeth to get the documents from — from

22   PennyMac and get accurate documents and not just pieces of

23   paper.

24          So what we would like the Court to do is to rule that

25   we — we don't have to answer the summary judgment motions until

1   we've been able to complete discovery, to require PennyMac to go

2   back through their request for production and interrogatories

3   and do them correctly and — and promptly.

4          And I — I'd ask to take the deposition of the

5   individuals who the proof of claim indicates signed the proof of

6   claim.  And that would be Ms. Camarata and Mr. Luzano

7   (phonetic).  And I — I believe that that's — is proper for the

8   debtor here to depose whoever signed that proof of claim,

9   because whoever signed that proof of claim based their signature

10  on that proof of claim upon reviewing documents.  If they

11  didn't, then there's going to be a problem there, too.

12         THE COURT:  Well, let me ask a question.  PennyMac has

13  filed a motion — or two motions for summary judgment.  And I'm

14  assuming that among other allegations — I haven't read the

15  motions for summary judgment or reviewed the evidence in support

16  of it yet — but I'm assuming that among the allegations they

17  make there are that PennyMac is the owner and holder of the

18  note; and in light of the fact that there's this disputed chain

19  of title, I'm assuming that PennyMac addresses that in some way.

20  So here's a question that I have for you about your discovery,

21  Mr. Newbern, and that is:  In those motions for summary judgment

22  and — and the evidence that supports them is PennyMac making

23  some broad-brushed allegations about the ownership of the note

24  and deed of trust; and you tried to take discovery to find out

25  the basis for those broad-brushed obligations; or have they made

1   specific allegations about ownership of the note and you've

2   tried to get discovery and you haven't been able to find any

3   support or at least scant support for the specific allegations?

4          MR. NEWBERN:  Yeah.  The — the affidavits, one of them

5   is — is from someone named Lori Lewis (phonetic), who at one

6   point we asked her — asked them where she was, and they — they

7   can tell us where she is.  But their — they've thrown her

8   affidavit in there as sort of a quasi-business record affidavit.

9   But I don't think it qualifies as such.  And they've — I think

10  they loosely allege ownership.

11         They refer to the note and the allonges.  They never

12  addressed the issue or the fact that the allonges are not now

13  and do not ever appear to have been attached to the notes.  And

14  I — I think the law is pretty — pretty clear that for an allonge

15  to transfer a note it's got to be attached, it's got to be

16  affixed to it.

17         And normally on a transfer of a note, you do it on the

18  bottom of the note with a — normally you see a stamp on there

19  that says so-and-so, and then they sign it.  There's no stamps,

20  there's no assignments on the — on the note itself.  The only

21  assignments are in these half a dozen or so allonges that are —

22  are confusing.  And, as I mentioned earlier, appear to be

23  nothing more than rubberstamped signatures.

24         THE COURT:  So, by your account, if you look at the

25  motion for summary judgment, is the motion for summary judgment

*Plaintiff's Emergency Motion*                                    11

1   detective on its face?

2           MR. NEWBERN:  I — I think they are, but it would

3   require a good amount of work on our part to go through here and

4   try to respond to this without — first, without our discovery

5   being complete; without PennyMac having been required to address

6   the — the discovery with regard to the production of documents

7   and answer the interrogatories, to swear to them.  We — we

8   shouldn't have to answer a motion for summary judgment when

9   there's discovery pending out there.

10          THE COURT:  Ms. Camarata?

11          MS. CAMARATA:  Hi, Judge.  All right.  Let me start

12  off by saying that the plaintiffs have continued this trial

13  three times.  Until August there has been no discovery request

14  made by the plaintiff in this adversary case.

15          The discovery that Mr. Newbern is talking about was

16  filed in the main case.  And it was to get discovery pursuant to

17  an objection to the proof of claim.  That discovery was timely

18  answered.  And it was sent to Mr. Newbern.  I — and I — and I

19  have not heard one word from him, prior to the filing of a

20  motion to compel that there was any problem with any of the

21  discovery that I sent with him — sent it to him.

22          There was no certificate of conference prior to filing

23  the motion to compel.  I never knew that he never received the

24  interrogatories back in April.  And he has propounded no

25  discovery, no deposition notices, or anything else until August,

*Plaintiff's Emergency Motion*                                          12

1    in this case, Your Honor.

2           The discovery was thoroughly answered.  As I said, he

3    didn't dispute anything or have any questions about any of the

4    answers.  All of the relevant documents have been provided to

5    Mr. Newbern.  He has the complete chain of title.  There is no

6    dispute about the chain of title.

7           Moreover, this is a — we have the original note, the

8    original deed of trust.  This is bearer paper.  The allonges are

9    included in the file.  There is no law that says that they have

10   to be attached.  It has to be in with the original, and they

11   are.

12          Furthermore, this loan went through the FDIC.  As

13   such, the only evidence that can be considered is anything that

14   is in writing.  The law is pretty clear on that matter.  And

15   because of that the really only relevant information is what is

16   in writing, the individual contract and what came from the FDIC.

17   And he has all the information.  The only basis for the

18   objection to the proof of claim was documentation.  He's got all

19   the documentation.  There is no need to have either Mr. Luzano

20   or myself testify as to the documentation that was attached to

21   the proof of claim.

22          THE COURT:  Now who is Mr. Luzano?

23          MS. CAMARATA:  Mr. Luzano is actually the attorney

24   that prepared the proof of claim.  My name is also on there, but

25   I really have no personal knowledge of any of it because I

*Plaintiff's Emergency Motion*                                    13

1    didn't do any of it.  They just had two names on the proof of

2    claim when it was filed in this case.

3          And what he can testify to is how that claim was

4    prepared and the documentation that he received from the client.

5    But the client has already testified as to the documentation.

6    And it has all been produced.  And there really is nothing

7    missing, whatsoever.

8          This case has basically — I mean Mr. Newbern talks

9    about fraud.  The debtor has done nothing in this case.  He's

10   made no payment.  He has done nothing other than to try and sow

11   discord regarding this case.  The original allegations were not

12   brought in good faith.  They were not within the statute of

13   limitations.  The plaintiff knew that they were not within the

14   statute of limitations.  He has some of the same allegations in

15   his objection to the proof of claim.

16         THE COURT:  Is the adversary proceeding combined

17   procedurally with the objection to the proof of claim?

18         MS. CAMARATA:  Yes, it was, Your Honor.

19         MR. NEWBERN:  They're — they're together in one — one

20   place, Your Honor.  The objection to claim and this adversary

21   are all together.

22         THE COURT:  Okay.

23         MS. CAMARATA:  Okay.  As soon as he asked for my

24   client's deposition, that was provided.  He did not have any

25   difficulty whatsoever in getting my client here for a

*Plaintiff's Emergency Motion*                                    14

1    deposition, Your Honor.  We did ask initially if it could be by

2    phone, he refused.  My client flew in from California

3    specifically for the deposition.  He was available as long as

4    they needed him.  And he answered all of their questions, even

5    when the questions were borderline.

6           Ms. Lewis is, I believe, an ex-officer of one of the

7    originating banks.  I'm not sure which one, or maybe of both.  I

8    think maybe of both.  I don't have her affidavit in front of me

9    right now.  But her affidavit was provided over a year ago.  I

10   don't know if she is still around or not.  I believe she was in

11   Utah at the time.  But she is in no way affiliated with

12   PennyMac.

13          And, in reality, since the loan went through the FDIC,

14   since Ms. Lewis was there, it's really irrelevant.  The only

15   relevance is really since the FDIC took this over.  The

16   underlying organizations went into receivership.  J.P. Morgan

17   was one of the intervening entities that also held it for a

18   certain amount of time, at least.  But it — that was also before

19   it went into receivership.  So it's really not confusing.  It's

20   all laid for the plaintiff.  They — they've seen every single

21   document.  It's all in chronological order.

22          Regarding the responses to the requests for

23   production, there were objections in the responses and the

24   documents were not, you know, one, two, three, four, five, six,

25   because some of them applied to more than one question.

1  However, each of the documents were listed in the responses as

2  to which documents were being referred to.

3        And again, as I said, they weren't in this adversary,

4  they were in the main case.  So to file a motion to compel in

5  this an adversary is really not the correct thing to do because

6  the discovery was not propounded in this adversary.

7        THE COURT:  Now you say the note — the note is made

8  payable to bearer?

9        MS. CAMARATA:  Well, we've got the original note, Your

10  Honor.  I mean —

11        THE COURT:  Again, but that's my question.

12        MS. CAMARATA:  If the bearer is —

13        THE COURT:  Is — is the original note made payable to

14  bearer?

15        MS. CAMARATA:  It's not made a payable to bearer, but

16  it's a bearer instrument.  I mean the original note came to the

17  original lender —

18        THE COURT:  Isn't that unusual?  I'm — I'm not

19  familiar with — with promissory notes that support mortgages to

20  typically be bearer notes, or am I — am I wrong about that?

21        MS. CAMARATA:  They usually are bearer instruments,

22  Your Honor, which is why the original notes are usually held in

23  vaults and why they're never — you only get copies of them,

24  unless you specifically ask for an original, because usually

25  they — they are — if they're a paper, you know, the original —

*Plaintiff's Emergency Motion*                                              16

1       THE COURT:  Oh, but let me — well, let me ask the

2  question.  The note that — the original of this note, who is it

3  made payable to?

4       MS. CAMARATA:  First National Bank of Nevada, I

5  believe.  And then it went to the First National Bank of

6  Arizona.

7       THE COURT:  Okay.  And so how does a note like that

8  ultimately become a bearer instrument?

9       MS. CAMARATA:  Well, that's why they did the allonges,

10  to go along with it.

11       THE COURT:  Okay.

12       MR. NEWBERN:  The — the problem here, Your Honor, is

13  we don't know who did the allonges.  We don't know that they

14  were authorized to execute them, or that they were, you know — I

15  — I could just have Mr. Everett here sign some, sign them for

16  me, but —

17       MS. CAMARATA:  Your — Your Honor, I do have that.  I

18  have an affidavit as to each one of those allonges and each one

19  of the instruments.  So there is that.  There has been no one

20  else that claims they own these notes and deed of trust.  There

21  is no opposition to us certifying that.  And I don't see how the

22  plaintiff can show that we are not the owner when we have all

23  the documentation.

24       THE COURT:  Well, I've seen some of these allonges, I

25  recall.  And — and, Ms. Camarata, the — these — these affidavits

*Plaintiff's Emergency Motion* 17

1   that you have, that you say accompany these — the notes and the

2   allonges, do these affidavits basically address each one of the

3   assignments?  I mean are they — do they — at least can they be

4   placed chronologically in order, so it goes from A to B to C to

5   D, and then — and then the affidavits support that?

6           MS. CAMARATA:  Yes, Your Honor, that's what I believe

7   that we did.  We have an affidavit as to prior to FDIC, as to

8   all the allonges.  And then we have an affidavit as to post that

9   — FDIC.

10          THE COURT:  And do you dispute that, Mr. Newbern?

11          MR. NEWBERN:  I — I don't think that — I don't think

12  we have an aff- — there's — there's two affidavits attached to

13  the motion for summary judgment, one by someone at the FDIC and

14  the other by Lori Lewis — is that who it was?

15          MS. CAMARATA:  Lori Lewis, correct.

16          MR. NEWBERN:  And — and I don't — I don't believe that

17  these affidavits track the chain of title.  If you look at Ms.

18  Lewis' affidavit, it's pretty loosely-goosey about what she's

19  saying.  And, of course, we — we don't have the — I'm looking at

20  Ms. Lewis' affidavit right now.  And it says:

21          "My name is Lori Lewis.  I'm more than 21 years of

22  age, have never been convicted of a felony, am of sound mind and

23  confidence make this affidavit.  I acquired personal knowledge

24  of all facts contained herein in my capacity as an officer of

25  First National Bank of Arizona and First National Bank of

1    Nevada.  And all the information contained herein is true and

2    correct."

3            And then she attaches eight pages of records from

4    First National Bank of Arizona that — I don't see any — it

5    certainly doesn't include all of the allonges.  One of the

6    allonges that they do attach, that has the signature of Amy

7    Hawkins on it, it's an undated allonge.  And it — it is pretty

8    clear to me that these are stamped signatures.

9            THE COURT:  Well, I suppose if there can be several

10   different levels of problems when we get the documents like

11   these, one of these could be a very carefully-crafted affidavit,

12   in which Ms. Lewis says exhibit A is the original note; exhibit

13   B is the assignment of the original note from — from A to B;

14   exhibit C is the assignment of the note from C to D.

15           In other words, the documentation is all there and the

16   chain a custody is proven up via the affidavit, with some degree

17   of precision.  But The plaintiff looks at that thing and says:

18   'Well, you know what, it may be a well-crafted affidavit that

19   establishes chain of title, but I don't how Ms. Lewis knows this

20   stuff.  It doesn't explain how it is that she has personal

21   information about any of the things that she's testifying to in

22   the affidavit.  And so really it's a question of her

23   credibility.  And I have the right to take her deposition in

24   order to test whether or not she's credible and whether she can

25   ultimately substantiate those claims that are included in that

*Plaintiff's Emergency Motion*                                          19

1   affidavit.'

2          That's kind of one form of — of an attack upon that

3   type of evidence.

4          The other one might be that, 'Hi.  My name is Ms.

5   Lewis.  And appended hereto are the documents that relate to

6   this case.'

7          And you look at those documents and, A, they — they

8   either substantiate a chain of custody or, alternatively, they —

9   they don't really do anything.  They're just — they're there,

10  but they're pretty ambiguous in terms of what it is that they

11  mean.  And it may very well be that we could go take an — we

12  could go take a deposition of Ms. Lewis.  And the only thing

13  that Ms. Lewis could possibly say would be, 'All I can tell you

14  is that these are the documents in our file.'  And if that's all

15  her affidavit says, then I don't know that we need to go take

16  Ms. Lewis' deposition, because basically the affidavit contains

17  everything that she knows.

18         So I could see in the first instance where there might

19  be a need to take Ms. Lewis's deposition, to test whether or not

20  she really knows the things that she's saying about.  But if all

21  she's saying is, 'I'm the custodian in the sense that I'm

22  designated to be the custodian and these are the documents that

23  are in our records,' then either those documents are going to be

24  sufficient in and of themselves to get bank to where they want

25  to be, or they're not going to be.  But — but a deposition of

*Plaintiff's Emergency Motion*                                              20

1   Ms. Lewis is not really going to be very edifying.

2          So I guess one of the problems I'm having right now is

3   I don't know which category this falls into or whether it's a

4   different category that I'm just not thinking of right now.

5          MS. CAMARATA:  Well, Your Honor, I believe that she is

6   — I mean her affidavit is certainly sufficient.  I don't see

7   what else they could ask her about it.

8          She states in her affidavit she acquired knowledge of

9   the facts, as her capacity as an officer of First National Bank

10  of Arizona and of the First National Bank in Nevada.  Those

11  institutions went into receivership.  They're no longer there.

12  She has no records that she could even refer to.  Everything

13  went to the FDIC.

14         So — and, you know, this all happened a number of

15  years ago.  So her recollection may be somewhat different than

16  the actual documents, which is one reason why the FDIC is

17  allowed to rely on its defense that the only thing, you know,

18  after a certain amount of time, is the only thing you can rely

19  on is the written documentation that is in the loan file, which

20  we have and which we have provided.

21         The plaintiff made no claims against the FDIC prior to

22  that time period running out.  So therefore my defense is that

23  they have the written documents, there isn't anything else, and

24  there's no need to even go look for Ms. Lewis.  But of course

25  they're welcome to go try and subpoena her.  She's not an

*Plaintiff's Emergency Motion*                                    21

1   employee of PennyMac.  You know, another attorney got her

2   affidavit for me a year ago, which is when it was written and

3   filed in this case.

4          MR. NEWBERN:  Her affidavit doesn't say she's a

5   custodian of the records.  I mean I don't think you could make

6   that affidavit into a business records affidavit.

7          MS. CAMARATA:  No, it said she had personal knowledge.

8          MR. NEWBERN:  All right.  You could have knowledge and

9   not be the custodian.

10         THE COURT:  Well, no, no.  You know when we're talking

11  about things like notes and allonges,...

12         [IN THE BACKGROUND ON THE TELEPHONE]:  Yeah, just go.

13  I'll just —

14         THE COURT:  I don't know that a note or an allonge can

15  be authenticated as a business document.  They're operative

16  documents.  Typically speaking, they're considered to be

17  operative documents and not necessarily business documents.

18         I guess I need to go back to you, Mr. Newbern.  What —

19  what is it that you want here?  I mean specifically what — what

20  relief do you want here?

21         I — I get a lot of — you know, I get a lot of

22  discovery requests in which people go, 'They didn't turn over

23  all the documents.  Make them turn them all over;' and the other

24  side goes, 'Well, we've given them everything that we've got.'

25  That's a difficult request for me to respond to, because I don't

1   know whether they have them or not.

2         MR. NEWBERN:  Yeah.

3         THE COURT:  But I think what we have Ms. Camarata

4   saying is, is that 'Everything we've got that's responsive to

5   the request we've given to them, and so there's not anything

6   more for us to give to them.'

7         And if I look on your side, Mr. Newbern, and — and I

8   say, 'Well, listen, if they've given me everything they've got,

9   then they haven't got a case,' and I would think that you would

10  be satisfied with that landscape and wouldn't want them to be

11  turning over other things that could actually be prejudicial to

12  your client, because if your position is is that 'What they've

13  given me isn't sufficient,' then I think that's — that's exactly

14  where you want to be.

15        So — and as far as the way that documents are

16  produced, what the rule says is that you've produced them as

17  they're kept in the ordinary course of business, or you can

18  categorize them in specific response to one particular

19  interrogatory or another, or a specific request for production.

20        So, you know, it sounds to me like the bank tried to

21  adopt the latter procedure, and the debtor is saying, 'Well, I

22  don't think they're responsive to requests for production number

23  1 or number 5 or number 7.'

24        Well, but there again if the debtor has said, 'Give me

25  these document — here's my request number 1.  Give me these

*Plaintiff's Emergency Motion*                                                23

1   documents that show so-and-so'; and the defendant response to it

2   says, 'Here's all of the documents that are responsive to that

3   request'; and the plaintiff looks at him and goes, 'Well, those

4   aren't responsive at all,' then in a sense that's as good as it

5   gets for the plaintiff.  Because to have documents that don't

6   support the defendant's position is really what the plaintiff

7   wants to establish in the first place.  So I'm not sure what I

8   can do about that.

9        On the issue of interrogatories, I guess I'm being

10  told that the interrogatories are vague — vague and not really

11  responsive.  I'm not really sure what to do about that either.

12       MR. NEWBERN:  They're not sworn to either.

13       THE COURT:  Well, they do need to be sworn to.

14  Insofar as — well, the motion to compel was brought in the

15  adversary proceeding, but the requests were made in the context

16  of a contested proceeding or a contested matter in the main

17  case.

18       I think, Ms. Camarata, you're probably technically

19  correct about that.  But if they weren't ever — if they weren't

20  sworn to and if they weren't served upon Mr. Newbern and the

21  defense is, 'Well, really they should have brought this motion

22  to compel in the context of the main case and not the adversary

23  proceeding,' I might agree with you procedurally but disagree

24  with you substantively.

25       And if — and I never know how to resolve the issue of,

1   'Well, I sent them out' and the other side says, 'Well, I never

2   received them.'  A lot of times that just kind of boils down to

3   my own familiarity with lawyers and — and whether or not I hear

4   these kind of recurring themes from them — them or not.  And all

5   I can say about that is that I guess I deal pretty routinely

6   with Mr. Newbern and I don't hear him say that very often.  So

7   if he said he didn't get it —

8           MS. CAMARATA:  Your Honor?

9           THE COURT:  Yes, ma'am.

10          MS. CAMARATA:  And, Your Honor, and I told Mr. Newbern

11  this.  And I thought I had sent them out on April the 9th.  What

12  I sent was two copies of the responses to requests for

13  production, instead of one copy of the response for request for

14  production, and then the responses to the interrogs.

15          THE COURT:  Okay.  So —

16          MS. CAMARATA:  So he — he said — no, there is no

17  dispute that he did not get them when he should have.

18          THE COURT:  Okay.  All right.  Well, that's — that's

19  good to know.

20          MS. CAMARATA:  Yeah.  No.

21          THE COURT:  All right.  So —

22          MS. CAMARATA:  I just wanted to make sure that was in

23  there.

24          THE COURT:  — then on that one, I mean if he just got

25  responses to those requests for — well, up to those

1    interrogatories, then on that grounds I'm willing to give him

2    some additional time to respond to the motions for summary

3    judgment.  And so then it just gets down to a question — I — I

4    don't know, Mr. — Mr. Newbern, are you asking to compel the

5    PennyMac here to come — to produce witnesses in response to

6    notices of deposition?

7              MR. NEWBERN:  I — I don't think there's a notice on

8    the table.  They — they didn't file their Rule 26 disclosure

9    until the first part of August, I believe.  So — and they've had

10   Mr. Tomescu in there and they had a little bit of information

11   about documents.  But — and we took his deposition.  But the —

12   the proof of claim is — if you look at the proof of claim that's

13   filed with the Court, it is filed in such a way that both Ms.

14   Camarata and Mr. Luzano signed it.  And I — I doubt that both of

15   them signed it.  But whoever signed it, I would like to take

16   that person's deposition because I'd like to know what documents

17   they relied upon in — in signing that proof claim.

18             THE COURT:  What's the relevance of the — well, I

19   guess the proof of claim has been objected to.

20             MS. CAMARATA:  Yes, Your Honor.  But it's the exact

21   same allegations that are in the adversary.  And that's why they

22   were consolidated.

23             The only thing he's objecting to in the proof of claim

24   is the documentation that supports the lien.  And that's the

25   exact same allegation that he's got in the adversary.  Mr.

1   Luzano can speak to that.  The stuff that was — the documents

2   that were attached to the proof of claim regarding that issue

3   would be the note, the deed of trust, the assignments, and

4   alonges, all of that, which, you know, we — you know, there's

5   no way that we would be able to authenticate any of those

6   documents.  Those were all the client's documents.

7            MR. NEWBERN:  Here — here's the problem, Your Honor —

8            MS. CAMARATA:  And —

9            MR. NEWBERN:  — with — with — are you through,

10  Cristine?

11           MS. CAMARATA:  Well, —

12           THE COURT:  Yes, I am.  I'm listening.

13           MR. NEWBERN:  Here's the problem with the — the

14  assignment.  It's — it is the original note — or deed of trust,

15  assigns the deed of trust, or — or names MERS as a nominee.  I

16  don't know what that is.  But after the deed of trust was filed,

17  it — it doesn't appear anywhere until about a year ago, when Mr.

18  Tomescu shows up as an assistant secretary of MERS, and he

19  executes an assignment from MERS to PennyMac.  I mean just out

20  of the blue.  And we don't have any — any proof other than Mr.

21  Tomescu's word that he is an assistant secretary of MERS.  My —

22           MS. CAMARATA:  Your —

23           MR. NEWBERN:  — research — my research is that MERS

24  has some 20,000-plus assistant secretaries and assistant vice

25  presidents all over the country that they appoint to execute —

*Plaintiff's Emergency Motion*                                        27

1   sign these documents as — as needed.

2          And I don't think that there's any — I — I'd almost

3   bet money that there's no record of the board of directors of

4   MERS ever appointing Mr. Tomescu as assistant secretary.  Now

5   they may be able to produce pieces of paper that say that.  But

6   they're — they're just hearsay.  I mean they're just — they're —

7   they're — they're just paper.

8          MS. CAMARATA:  And we did provide the corporate

9   resolutions to that, Your Honor, in response to the request for

10  that at the deposition.

11         MR. NEWBERN:  Yeah.

12         THE COURT:  Well, but going back to Mr. Luzano, I

13  don't know how Mr. Luzano is going to be able to add anything to

14  all this.  It strikes me that Mr. Luzano, in all likelihood

15  being a lawyer Mr. Luzano relied upon conversations that he had

16  with his client and relied upon — and — and relied upon some

17  documents that he received in order to sign this proof of claim.

18         But, ultimately, if the documents themselves are

19  insufficient, then I go back to one of my earlier points.  And

20  that is is that if you look at those documents and you say to

21  yourself, 'Those documents don't get PennyMac to where they want

22  to be,' then it strikes me that's where — that's the position

23  that the debtor likes.  And why you would want to go take Mr.

24  Luzano's deposition, to have him fill in those blanks, I'm not

25  sure why you'd want to do that if you can't — you know, if — if

*Plaintiff's Emergency Motion*                                              28

1   you've said produce people who can fill in the blanks, and

2   they've already produced people, and your theory is they haven't

3   filled in the blanks, then it seems that the debtor is in a

4   position where he wants to be.

5          But I'm not sure that Mr. — that Mr. Luzano has very

6   much to add to this process —

7          MR. NEWBERN:  That was —

8          THE COURT:  — even on an objection to claim.  And if

9   he's the person that signed the claim, he just signed as a

10  lawyer.  And if all he's going to do is just go, 'Well, this big

11  stack of documents that we gave to you, that's what I based it

12  upon.'

13         You want to disagree as to whether or not that gets

14  you there or not, but I'm — if that's all that Mr. Luzano has,

15  I'm not sure it either adds or detracts in any way from the

16  case.

17         MR. NEWBERN:  Very well.  Can we have — I'm trying to

18  think this — if we could have 21 days to respond to the motion

19  for summary judgment, from whenever I get the properly-executed

20  interrogatory, that would —

21         THE COURT:  Okay.  Let me ask this question:  Do we

22  have a hearing set for the motion for summary judgment, Ms.

23  Camarata?

24         MS. CAMARATA:  Yes, we do, Your Honor.  September the

25  8.  And he did get the interrogatory today.

*Plaintiff's Emergency Motion* 29

1      THE COURT:  Okay.  All right.  Then you want 21 days

2  from the day that you receive the interrogatories; is that

3  right, Mr. Newbern?

4      MR. NEWBERN:  When I receive interrogatories that have

5  been sworn to.  The — the ones that we have are not — they're

6  not sworn to.  And I don't know who's going to swear to them.

7      THE COURT:  Yeah, I take it —

8      MR. NEWBERN:  Not that part of that —

9      THE COURT:  — surely — surely you have somebody up

10 there that can't swear to those — to those interrogatory

11 responses, don't you, Ms. Camarata?

12     MS. CAMARATA:  Yes.  And it was Ted Tomescu who

13 they've already deposed, Your Honor.  And they deposed him on

14 August the 16th.  So I mean all those questions have been

15 answered by Mr. Tomescu.

16     I really don't see where they need any additional time

17 on this matter to respond to the — to the summary judgment.

18 It's really pretty straightforward as, you know, this is the

19 train of title and, you know, I — I just don't really see it.

20 And he's already had a couple weeks.

21     THE COURT:  Well, I understand but, you know, it's not

22 really an interrogatory responds until it's verified by the

23 party upon whom it's served.  And right now it's basically —

24 it's — it's a draft of an interrogatory response.

25     And so the — the problem that we have with that

*Plaintiff's Emergency Motion*                                          30

1    somewhere down the road is if the other side wants to rely upon

2    the interrogatory responses, and the other one can always go,

3    'Oh, well, Judge, we sent them a draft.  That's — if you go look

4    at it, it doesn't even bear our client's signature,' and then we

5    have to broach the issue of whether or not that's the real

6    interrogatory response or there's — there's just a complete

7    default in responding to it.  And what's the effect of the

8    failure not to respond at all.  Does it mean your pleadings get

9    stricken, or whatever.

10          The easiest thing to do is just to ask Mr. Tomescu to

11   go ahead and execute the verification of it.  And that way our

12   record will be clean, whichever way it happens to go.

13          MS. CAMARATA:  Yeah, I will do that, Your Honor.

14          THE COURT:  Okay.  If you'll do that, then I'll give

15   Mr. Newbern a 21-day extension of time on his hearing until such

16   — the 21 days running from the date that he gets served with a

17   copy of the signed responses to the interrogatories.  And so

18   then at that point, the parties, if you would, please, just get

19   together with my Courtroom Deputy Ms. McCrory and see if there

20   is — there is a convenient date following, whatever date that

21   happens to be for the two of you, and see if you can get it set

22   on that date.

23          MR. NEWBERN:  Very well.

24          MS. CAMARATA:  I will do so, Your Honor.

25          THE COURT:  Okay, parties, thank you.  We'll be

*Plaintiff's Emergency Motion*                                        31

1    adjourned.

2              MR. NEWBERN:  Thank you for the —

3              MS. CAMARATA:  Your Honor?

4              THE COURT:  Oh, yes, ma'am.

5              MS. CAMARATA:  We are set for trial, a docket call I

6    think on September the 13th.  So there is no way —

7              THE COURT:  Right.

8              MS. CAMARATA:  — that —

9              THE COURT:  All right.  We'll just move your — I'll

10   tell you what we'll do, we'll — we're going to move you — we'll

11   move you to your trial — we'll move you to a November trial

12   docket call.  That is November the 1st at 1:30.

13             MR. NEWBERN:  Thank you, Your Honor.

14             MS. CAMARATA:  Your Honor, are you going to be

15   extending the deadlines on that or are we going to keep the

16   deadlines the same as they are now?

17             THE COURT:  Oh, let's just — no, we'll extend all

18   deadlines.  I'm not sure which form of scheduling order that we

19   have like — whether we're under a default order or whether we're

20   with the specific deadlines that are set forth in there.  But

21   we'll just run — will run it off of the default deadlines in

22   relation to that November 1 date.

23             MS. CAMARATA:  All right, Your Honor.

24             THE COURT:  Okay?

25             MR. NEWBERN:  Thank you.

*Plaintiff's Emergency Motion*                                     32

1          THE COURT:  Thank you, parties.

2          MR. NEWBERN:  Thank you.

3          MS. CAMARATA:  Thank you.

4          MR. BLOSSOM:  Thank you, Your Honor.

5          THE COURT:  We adjourn.

6      (The hearing was concluded at 4:49 o'clock p.m.)

7                          —oOo—

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

State of California                    )
                                       )     SS.
County of San Joaquin                  )


      I, Susan Palmer, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages, of the digital recording provided to me by the United States Bankruptcy Court, Northern District of Texas, Office of the Clerk, of the proceedings taken on the date and time previously stated in the above matter.

      I further certify that I am not a party to nor in any way interested in the outcome of this matter.

      I am a Certified Electronic Reporter and Transcriber by the American Association of Electronic Reporters and Transcribers, Certificate No. CERT 00124.  Palmer Reporting Services is approved by the Administrative Office of the United States Courts to officially prepare transcripts for the U.S. District and Bankruptcy Courts.


Susan Palmer
Palmer Reporting Services

Dated September 27, 2010